J-S17002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAVONE LAROME GORDON | : | |
| | : | |
| Appellant | : | No. 2587 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 19, 2024
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0000036-2022

BEFORE: MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY MURRAY, J.: **FILED JUNE 3, 2025**

Javone Larome Gordon (Appellant) appeals from the judgment of sentence imposed following his conviction by a jury of three counts of criminal conspiracy, two counts of robbery, and one count of theft by unlawful taking/disposition (with the value taken from a bank being between $2,000 and $100,000).[1] The trial court found Appellant guilty of harassment.[2] Counsel for Appellant, Goerge S. Yacoubian, Jr., Esquire (Counsel), has filed a petition to withdraw from representation and a brief pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978

_____

[1] 18 Pa.C.S.A. §§ 903, 3702(a)(1)(iv) & (vi), 3921(a).

[2] 18 Pa.C.S.A. § 2709(a)(1).

A.2d 349 (Pa. 2009). After careful review, we grant Counsel leave to withdraw and affirm Appellant's judgment of sentence.

On March 5, 2020, Appellant entered the S&T Bank (the bank) located in Kennett Square, Chester County, Pennsylvania, soon after it had opened for the day. Upon entering the bank, Appellant approached and jumped over the teller's counter, pushing aside bank teller Sharon Louise Kelp (Ms. Kelp). Appellant demanded all of the cash from Ms. Kelp's drawer. Appellant also demanded and stole U.S. currency from the drawer of another teller, Keila Rodriguez (Ms. Rodriguez). Appellant unsuccessfully searched the bank for more cash, then fled.

After leaving the bank, surveillance video captured Appellant entering the passenger seat of a dark blue Chrysler 300, which drove away from the scene and was abandoned in a nearby alley. Surveillance footage further showed a man wearing clothing similar to the bank robber's clothing exit the Chrysler 300, enter a Ford Crown Victoria, and leave the scene.

Police subsequently found the Crown Victoria abandoned in Wilmington, Delaware. Police found a receipt listing Appellant's name in the center console area of the Crown Victoria. DNA taken from the Crown Victoria matched the DNA of Appellant and his co-defendant, Irvin Cornelious (Cornelious). Cell phone GPS records placed Appellant entering Pennsylvania before the robbery, and in the vicinity of the bank one day before the robbery, and at the time of the robbery.

Appellant and Cornelious were arrested and jointly tried before a jury. The jury convicted Appellant of the above-described charges.[3]  On September 19, 2024, the trial court sentenced Appellant to an aggregate prison term of 7-14 years.  Appellant filed no post-sentence motions, but timely filed an appeal.

On September 26, 2024, the trial court entered an order requiring Appellant to file a concise statement of errors complained of on appeal.  The trial court subsequently granted Appellant an extension of time within which to file his concise statement.  On November 25, 2024, in lieu of a concise statement, Counsel timely filed a statement of his intention to withdraw from representation and file an **Anders** brief with this Court.  **See** Pa.R.A.P. 1925(c)(4) (permitting counsel to file a statement of intention to withdraw from representation, in lieu of filing a concise statement of errors).  The trial court issued a brief opinion noting Counsel's intention to withdraw.  Trial Court Opinion, 11/26/24.

Counsel filed in this Court filed both an **Anders** brief and a petition to withdraw as counsel.  "Before we address the merits of this appeal, we must determine whether counsel has complied with the procedures provided in **Anders** and its progeny," including **Santiago**.  **Commonwealth v. Dempster**, 187 A.3d 266, 270 (Pa. Super. 2018) (*en banc*).

_____

[3] The jury also convicted Cornelious of crimes related to the robbery. Cornelious is not a party to the instant appeal.

The following legal principles apply to our consideration of these filings:

Direct appeal counsel seeking to withdraw under **Anders** must file a petition averring that, after a conscientious examination of the record, counsel finds the appeal to be wholly frivolous. Counsel must also file an **Anders** brief setting forth issues that might arguably support the appeal along with any other issues necessary for the effective appellate presentation thereof ….

**Anders** counsel must [] provide a copy of the **Anders** petition and brief to the appellant, advising the appellant of the right to retain new counsel, proceed *pro se* or raise any additional points worthy of this Court's attention.

If counsel does not fulfill the aforesaid technical requirements of **Anders**, this Court will deny the petition to withdraw and remand the case with appropriate instructions (*e.g.*, directing counsel either to comply with **Anders** or file an advocate's brief on [the a]ppellant's behalf). By contrast, if counsel's petition and brief satisfy **Anders**, we will then undertake our own review of the appeal to determine if it is wholly frivolous.

**Commonwealth v. Falcey**, 310 A.3d 313, 314-15 (Pa. Super. 2024)

(quoting **Commonwealth v. Wrecks**, 931 A.2d 717, 720-21 (Pa. Super.

2007) (citations omitted)).

Our Supreme Court has further detailed court-appointed counsel's

duties:

[I]n the **Anders** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361.

- 4 -

Based upon our examination of Counsel's petition to withdraw and *Anders* brief, we conclude that he has complied with the requirements of *Anders* and *Santiago*. Counsel has filed a petition to withdraw, submitted an *Anders* brief detailing any issues that could be raised on appeal, and notified Appellant of his right to retain new counsel or proceed *in propria persona* and to raise additional issues. We are left, then, to determine independently the merits of Appellant's issues, since Counsel's right to withdraw "is conditional upon a finding that the appeal is wholly frivolous." *Commonwealth v. Burwell*, 42 A.3d 1077, 1083 (Pa. Super. 2012).

In the *Anders* brief, Appellant presents issues (1) challenging the sufficiency of the evidence underlying Appellant's convictions; (2) asserting a constitutional violation based on the racial composition of the jury; (3) challenging the verdict as against the weight of the evidence; and (4) asserting the ineffective assistance of trial counsel. *See Anders* Brief at 14, 15, 16, 17. We address each issue in turn.

Appellant first challenges the sufficiency of the evidence underlying his convictions.[4] *Id.* at 14. When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all

---

[4] Appellant fails to identify the particular element(s) of any charge not established by the Commonwealth.

reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa. Super. 2019) (citation omitted).

Regarding Appellant's conviction of theft, "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S.A. § 3921(a).

Pursuant to Section 3702(a)(1) of the Crimes Code,

[a] person is guilty of robbery if, in the course of committing a theft, he:

* * *

**(iv)** … threatens another with or intentionally puts him [or her] in fear of immediate bodily injury;

* * *

> **(vi)** takes or removes the money of a financial institution without the permission of the financial institution by making a demand of an employee of the financial institution orally or in writing with the intent to deprive the financial institution thereof.

*Id.* § 3701(a)(1)(iv), (vi).[5]

Appellant also was convicted of conspiracy to commit each of the above-defined crimes.

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> **(1)** agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> **(2)** agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

*Id.* § 903(a).

> A person commits the crime of harassment when,
>
> with intent to harass, annoy or alarm another, the person … strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same[.]

*Id.* § 2709(a)(1).

The following evidence was adduced at trial. Ms. Kelp testified that on March 5, 2020, she worked as a teller at the bank. N.T., 4/9/24, at 60. After

---

[5] Instantly, Appellant's robbery offense is graded as a third-degree felony, as he stole an amount of money greater than $2,000. *See* 18 Pa.C.S.A. § 3903(a.1).

- 7 -

the bank's lobby opened, "[a] gentleman jumped [over] the counter." *Id.* at 62. According to Ms. Kelp, "I asked him what he was doing[,]" to which the perpetrator replied, "it's a robbery, bitch." *Id.* In jumping over the counter, the perpetrator pushed Ms. Kelp aside. *Id.* at 63. Ms. Kelp testified, "I asked him what do you want? And then he … said he wanted all the money." *Id.* Thereafter, the perpetrator

> started checking the drawers in the back. And then he wanted my drawer to get opened, so I had to unlock it. And then he [saw Ms. Rodriguez]. And then he told her to come out and had her unlock her drawers.

*Id.*

> Ms. Kelp described the perpetrator as

> all dressed in black. Looked like brand new clothes, because it had … the Nike emblem on – I'm a shoe person, but I notice it on the shoes. They were … brand new shoes and they were like shiny. They were black with a swish on the side. He had … the jogging pants on, like the nice ones, not like gathered at the bottom. But … they were Nike pants. And the sweatshirt and … the hoodie, was black. And it was Nike also. And then he had … the gaiter and the sunglasses, the dark sunglasses.

*Id.* at 64. Ms. Kelp described the perpetrator as a skinny, African American male. *Id.* The perpetrator also wore gloves. *Id.* According to Ms. Kelp, the perpetrator "took all of the cash except for the mutilated [bills] and the two[-dollar bills]." *Id.* at 64-65. The perpetrator also stole cash from the drawer monitored by another teller, Ms. Rodriguez. *Id.* at 65. After the robbery, the perpetrator "jumped back over the counter and out the door." *Id.* at 74.

Ms. Kelp testified that the perpetrator exited the bank onto Cypress Street. *Id.* at 74-75. After exiting the bank, the perpetrator

> went directly into a dark sedan. It looked like a Chrysler. Like a … navy or black kind of Chrysler.
>
> ….
>
> He got [i]n the passenger side [of the vehicle]. … It took off. … He took off in the direction of the one-way street. He was going up the wrong way on the one-way street. That's … right across from [the bank] on Cypress [Street].

*Id.* at 75. Ms. Kelp described the Chrysler has having dark, tinted windows. *Id.*

Immediately after the robbery, Ms. Kelp described Ms. Rodriguez as "a nervous wreck[,]" and "shaken." *Id.* at 76. Police officers responded to the scene. *Id.* at 77. Ms. Kelp provided an officer with a description of the perpetrator and the Chrysler. *Id.* at 78. Ms. Kelp described the Chrysler as having a dark license plate, stating "[i]t probably was Delaware, more likely." *Id.* at 89. Ms. Kelp further testified that the bank had surveillance video, which would depict the robbery. *Id.* at 79-80.

Ms. Rodriguez testified that she also was a teller at the bank on March 5, 2020. *Id.* at 94, 96. She had been in a hallway "in the back" of the bank when she "saw the … man taking all the money from [Ms. Kelp's] drawer." *Id.* at 97. Ms. Rodriguez testified,

> I instantly panicked …. I was scared, something like that. And then as soon as the guy took her money[,] he saw me, and then he asked for my money.

- 9 -

*Id.* at 98. Ms. Rodriguez testified that she was frightened for her life: "I thought he's going to take a gun out. This is it. Because … I never experienced something like that before. So I was really, really afraid." *Id.*

Ms. Rodriguez testified that the perpetrator said to her, "where's your money, give me all your money." *Id.* at 99. Ms. Rodriguez admitted that she was crying. *Id.* at 100. According to Ms. Rodriguez, the perpetrator put the money in a bag that he had brought with him. *Id.* Ms. Rodriguez had approximately $5,000 or $6,000 in her drawer. *Id.* at 101. After taking money from her drawer, the perpetrator searched drawers located behind the tellers, but he found no additional cash. *Id.*

Bank employee Anthony Jasienski (Mr. Jasienski) testified that on March 5, 2020, he was employed in the bank's wealth management division, and would visit the Kennett Square branch at least once every two weeks. *Id.* at 106-07. On that day, Mr. Jasienski arrived at the bank shortly after it had opened for business. *Id.* at 107. Mr. Jasienski testified that

> as I pulled into the parking lot there was a vehicle. It was a dark blue Plymouth sedan that was parked right in front of the doors to the branch. And I waited behind that vehicle because I couldn't move up enough to be able to park where I wanted. So I thought someone was going to either come out of the branch or come out of the vehicle, and neither one of those two things happened.
>
> And so I just waited and that car pulled off, so I parked. And it wasn't very long later when we were robbed.

*Id.* at 108.

After arriving at the bank, Mr. Jasienski

went into [Ms. Kelp's] office … because I didn't have an office in those branches that I would visit….

…

    … I sat down at [Ms. Kelp's] desk.  And I was opening up my [e]mails and using the computer there.  [] I saw someone enter the bank.  They came in rather low and then sprung up and in just one leap jumped over that teller line….

….

    … They had gloves on and a mask, so I didn't really get a view of the individual themselves.

*Id.* at 107-08.  Mr. Jasienski telephoned the police after the perpetrator left the bank.  *Id.* at 113.

Christine Fox (Ms. Fox) was employed as an operations manager for the bank at the time of the robbery.  *Id.* at 129.  Ms. Fox testified that following the robbery, she was called to the bank to audit the tellers' drawers that had been violated during the robbery.  *Id.* at 133.  According to Ms. Fox, approximately $5,322 was missing from Ms. Rodriguez's drawer, including pre-marked bills known as "bait money."  *Id.* at 137.  Ms. Fox further testified that approximately $4,938 was missing from Ms. Kelp's drawer.  *Id.*

Kennett Square Borough Police Patrolman Jonathan Ortiz (Patrolman Ortiz) testified that he was dispatched to the robbery scene.  *Id.* at 139-41.  Patrolman Ortiz testified that, upon arriving at the bank, he

encountered the … reporting party.  … [S]he advised that the bank had just been robbed by a black male who came in, jumped over the counter and pushed her out of the way.

- 11 -

*Id.* at 141-42. Patrolman Ortiz discovered the perpetrator fled in a Chrysler 300, and he relayed the information over the police radio. *Id.* at 142. Patrolman Ortiz further testified that

> [s]hortly after relaying that information[,] it was advised by another officer who was on duty with me, stating that he had found a vehicle matching the description in the 100 block of Church Alley, which is directly across [the street from] where the … [b]ank was.

*Id.* at 142-43.

Patrolman Ortiz proceeded to the 100 block of Church Alley, where he observed a parked, dark blue Chrysler 300 sedan (the Chrysler 300). *Id.* at 143. Patrolman Ortiz described the Chrysler 300as follows:

> [F]rom my first observation of looking at the car[,] I noticed window tint on both the driver side and passenger side of the car, specifically on the two front doors where a person would be sitting. There was no other tint around the car[,] and it appeared that it was placed there … in a quick manner with the intention of hiding somebody's face.

*Id.* at 144.

A Church Alley neighbor, Albert McCarthy (Mr. McCarthy), testified that he is a retired police officer. *Id.* at 165. Mr. McCarthy told Patrolman Ortiz he reported the abandoned Chrysler 300 to the police department. *Id.* at 145. Mr. McCarthy further advised Patrolman Ortiz that he had video surveillance of the alley where the Chrysler 300 was parked. *Id.* Mr. McCarthy stated,

> [w]hen [the Chrysler 300] came up Church Alley and made the left on Juniper, the front wheels hit the curb; which it's a very

narrow street, that's not unusual. They ran up on the curb and then just stopped and left it there.

*Id.* at 173. Mr. McCarthy stated that right after the Chrysler 300 parked on Juniper Street, he observed "a large male with gray clothing on, like sweatpants[,]" leave the vehicle. *Id.* The man then walked down Juniper Street. *Id.* at 174. The next vehicle Mr. McCarthy observed was a blue Ford Crown Victoria, which picked up the man in the sweatsuit. *Id.* at 174-75.

The Chrysler 300 parked on Church Alley, and remained parked until March 5, 2020, at which time Mr. McCarthy took a photo of the Chrysler 300 and reported it to the police. *Id.* at 177. After returning from the police station, Mr. McCarthy observed that the Chrysler 300 had been moved to the middle of Church Alley, and the driver's side door was open. *Id.* at 180-81. Mr. McCarthy identified Commonwealth's Exhibit 26 as a photograph of the Chrysler 300, from his own surveillance video, with "a Delaware registration of 462333." *Id.* at 183. Mr. McCarthy further identified video clips from his residential surveillance system. *Id.* at 190. Mr. McCarthy identified one clip as accurately depicting the man who exited the Chrysler 300. *Id.* at 195.

Patrolman Ortiz described seeing a distinctive blue Ford Crown Victoria in the vicinity prior to the robbery. *Id.* at 153-54. Patrolman Ortiz testified that on February 29, 2020, he was on patrol for the Kennett Square Winterfest event. *Id.* at 153. According to Patrolman Ortiz,

Winterfest is an event where several distilleries come out and promote their beers [and] alcoholic beverages. And in particular,

- 13 -

there was a lot of traffic in town and I observed a particular vehicle that actually stood out that I observed throughout the day.

….

That was a dark blue Ford Crown Victoria with heavy, heavy window tint along every window.

….

That stuck out to me most due to the heavy tint, as well as the vehicle not being familiar [in] the area. I observed it. And with me growing up in the area, worked and patrolled there, I've never seen that vehicle there before.

*Id.* at 153-54. Patrolman Ortiz recalled seeing the Crown Victoria several times throughout that day. *Id.* at 155.

Kennett Square Police Detective Christopher Gravina (Detective Gravina) testified regarding his review of surveillance video from Mr. McCarthy's home. N.T., 4/10/24, at 51. Detective Gravina testified that the Crown Victoria in the video had tinted front driver's side and passenger's side windows. *Id.* According to Detective Gravina, the tint "was not flat, it was very bubbled and appeared to be installed in a hast[]y manner." *Id.* at 52. In addition, Detective Gravina testified that the Crown Victoria's front passenger side, right wheel cap is missing. *Id.* In addition, the vehicle had a Delaware license plate. *Id.* Detective Gravina testified that the Crown Victoria

had discoloration and markings consistent to the fact that there was a decal on it before and it was then removed. So on the [] passenger side of the car there's very distinctively an eight on the top of the roof there.

*Id.* at 53-54.  Detective Gravina further observed that

> just below that in various surveillance angles there [are] faded
> letters.  They're decipherable, but I don't know what the word
> said.  … There's a lot of cars that have tint, not so much [*sic*] cars
> that have windshield tint.

*Id.* at 54.

Detective Gravina identified several still photographs from the

surveillance video.  In particular, Commonwealth's Exhibit 44

> is the still [photo] of the subject that came out of the Chrysler 300
> and then walked to the corner to ultimately get into the Crown
> Victoria in the middle of the road.

*Id.* at 58.  Detective Gravina described that individual as wearing a gray

sweatsuit, and being "[o]n the taller side and skinny."  *Id.*

During his investigation, Detective Gravina also reviewed surveillance

video from a Shell gas station (the Shell station) in Hockessin, Delaware.  *Id.*

at 88.  The video is from February 27, 2020.  *Id.* at 89.  According to Detective

Gravina,

> the Crown Victoria is observed on the video pulling into the
> parking lot.  And then a gentleman gets out of the car, goes into
> the [Shell station] and makes a purchase and ultimately leaves
> towards Pennsylvania.

*Id.*  Detective Gravina identified the Crown Victoria as the same vehicle

depicted in the surveillance videos at the time of the robbery.  *Id.* at 90.

Detective Gravina based his identification on the unique features of the

vehicle, including the window tint, and the faded number eight on the roof.

*Id.*

- 15 -

Detective Gravina identified the surveillance footage that he had obtained from the Shell station. *Id.* Detective Gravina testified the grey ski cap worn by the man in the Shell station video is the same type of cap that was recovered by police from the back seat of the Crown Victoria. *Id.* at 93.

Detective Gravina further identified Appellant's co-defendant, Cornelious, from multiple still photographs taken from the Shell station's surveillance video. *See id.* at 100. According to Detective Gravina, the license plate of the Crown Victoria in the Shell station video has the same number as the Crown Victoria depicted in the Kennett Square surveillance videos. *Id.* at 101.

Detective Gravina testified that police executed a search warrant on the Chrysler 300, which had been parked in Kennett Square after the robbery. *Id.* at 102. Inside the vehicle, police found numerous water bottles, a brandy bottle, and window tint on the front driver- and passenger-side windows. *Id.* at 104-05. In addition, officers found a box of white medical gloves. *Id.* at 105. Detective Gravina discovered that the Crown Victoria was registered to Jasmine Britt (Ms. Britt), from Wilmington, Delaware. *Id.* at 119. Detective Gravina testified that Appellant is either a current or former paramour of Ms. Britt. *Id.* at 123.

License plate surveillance data received from the Delaware River Bay Police Department showed that the Crown Victoria and Chrysler 300 traveled at the same time, on the day of the robbery, from Delaware towards

Pennsylvania. N.T., 4/11/24, at 138-42. Approximately two hours later, the data showed the Crown Victoria, traveling alone, returning eastbound towards Delaware. *Id.* at 142.

On March 9, 2020, a probation officer in Wilmington, Delaware, Matthew Barba (Officer Barba), notified police that the Crown Victoria was found abandoned at 11th and Clayton Streets in Wilmington. N.T., 4/10/20, at 126. The Wilmington Police secured the vehicle, and executed a search warrant on its contents. *Id.* at 126. The Crown Victoria similarly had the faded number eight on its roof, and "cheap government rims" on the wheels. *Id.* at 130. A receipt police found inside of the center console, although undated, stated that

> it was received from [Appellant] for $1,000 for [] Cornelious. It indicates that there was a $1500 account with a payment of $1,000, and the balance due is $500. And there is a signature on the bottom, right-hand corner.

*Id.* at 132. A water bottle and gray knit cap were found in the middle rear passenger seat, as well as a brandy bottle on the floor. *Id.* at 133.

During his investigation, Detective Gravina discovered that the Crown Victoria was owned by Jerome Davis, and appeared to be primarily owned "on paper" by Cornelious. *Id.* at 140. Detective Gravina's investigation revealed that Cornelious had "a prior paramour relationship" with Jessica McDonald (Ms. McDonald). *Id.* Detective Gravina received phone records from Ms. McDonald's cell phone. *Id.* Her phone records showed "heavy

communication" between Mr. Cornelious and Ms. McDonald, "especially around the dates in question for this incident." *Id.* at 141.

Detective Gravina learned that Ms. McDonald is employed by the Delaware Cadillac dealership located on Route 52 in Wilmington, Delaware. *Id.* Following the robbery, police discovered the Crown Victoria approximately one and one-half blocks from that Cadillac dealership. *Id.*

Joseph Kukosky (Mr. Kukosky), a forensic DNA specialist for the Commonwealth of Pennsylvania and the Pennsylvania State Police, testified as an expert at trial. N.T., 4/11/24, at 29. Mr. Kukosky testified that Appellant's DNA was found on a swab taken from the Crown Victoria's steering wheel. *Id.* at 60-61. Appellant's DNA also was contained in a DNA mixture obtained from the Crown Victoria's gear shift. *Id.* at 61. Appellant's DNA further matched DNA obtained from the water bottle found in the center cup holder of the Crown Victoria. *Id.* at 65.

Cornelious's DNA was found on the steering wheel of the Crown Victoria. *Id.* at 53-54. Similarly, his DNA was found on the front, driver-side door handle of the Crown Victoria. *Id.* at 54-55. Cornelious's DNA was found on the brandy bottle and gray knit cap found in the Crown Victoria. *Id.* at 56, 67.

Cell phone records obtained from Cornelious indicated that at 10:00 a.m., on February 29, 2020, Ms. Britt called the cell phone used by Cornelious. *Id.* at 184. At that time, Appellant's and Cornelious's cell phones were located

in the same general vicinity. *Id.* At around 11:28 a.m., the "device associated with [Appellant] is in the general area of Kennett Square, using a tower … off North Mill Road or North Walnut Street." *Id.* at 185.

A review of Appellant's cell phone data from November 2019 through mid-March 2020 showed Appellant's phone in the Kennett Square area only on the days associated with the robbery. *Id.* at 192. Testimony established that

> [o]n March 4th, 2020, [at] about 10:33 [a.m., t]he device associated with [Appellant] is utilizing a cell site just east of Kennett Square Borough. That's about the same time … the blue Ford Crown Vic[toria] was captured on surveillance footage ….

N.T., 4/11/24, at 186. At about 11:30 a.m., Cornelious's device "is using a cell site just south of the Pennsylvania-Delaware line." *Id.* at 187-88. Later that day, between 7:30 and 8:30 p.m., devices owned by Appellant and Cornelious were in the same general area in Salem, New Jersey. *Id.* at 189.

On March 5, 2020, at 6:16 a.m., cell phone data shows that Appellant's phone is in the area of the Delaware Memorial Bridge. *Id.* at 195. In addition,

> [t]he blue Crown Victoria was captured by [a license plate reader] on the Delaware Memorial Bridge heading west. This cell site location information would be indicative of that same movement….

*Id.* Appellant's cell phone data also showed that Appellant's phone traveled within 100 meters of the bank. *Id.* at 199. At 8:34 a.m. that same day, Appellant's phone "is moving away from the Borough of Kennett Square." *Id.* at 199-200.

At 10:13 a.m., the cell phones owned by Appellant and Cornelious are located within close proximity to each other in New Castle, Delaware. *Id.* at 202. The cell phone records showed multiple communications between Cornelious, Ms. McDonald, and Ms. Britt. *Id.* at 203-04. Cornelious's cell phone was

> in Salem, New Jersey … the night before [the robbery]. Then it is in Wilmington at 9:12 or 9:13 [p.m.], again, in the area of Delaware Cadillac [dealership] ….

*Id.* at 204. Appellant's cell phone was in the same location as Cornelious's cell phone at that time. *Id.* at 205.

Thus, the evidence, both direct and circumstantial, established that Appellant committed the crime of theft from the bank, by unlawfully taking "movable property of another with intent to deprive him thereof." 18 Pa.C.S.A. § 3921(a).

In the course of committing a theft from the bank, Appellant intentionally placed Ms. Kelp and Ms. Rodriguez in fear of immediate bodily injury, and demanding and taking about $10,000 from the bank. Thus, the evidence sufficiently established that Appellant committed two counts of robbery. *See id.* § 3701(a)(1)(iv), (vi).

Finally, Appellant committed three counts of criminal conspiracy by conspiring with Cornelious to commit two counts of robbery and one count of theft. *See id.* § 903.

Based on the foregoing, we agree with Counsel's conclusion that a challenge to the sufficiency of the evidence underlying Appellant's convictions would merit no relief and is frivolous.

Appellant's second issue challenges the verdicts as against the weight of the evidence. *Anders* Brief at 15-16. Specifically, Appellant challenges the credibility of the Commonwealth's witnesses. *See id.* Counsel would conclude that these issues merit no relief, because this Court cannot substitute its own credibility determinations with those of the jury. *Id.* at 15.

To preserve a weight of the evidence claim, an appellant must raise the claim "with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A). The failure to preserve a weight claim pursuant to Rule 607 will result in waiver, even if the trial court addresses the claim in its opinion for this Court. *Commonwealth v. Thompson*, 93 A.3d 478, 490 (Pa. Super. 2014).

Appellant failed to preserve his weight challenge before the trial court. Accordingly, it is waived. *See id.*; *see also* Pa.R.A.P. 302(a) (stating an issue cannot be raised for the first time on appeal). We therefore conclude that a

challenge to the weight of the evidence would warrant no relief and would be frivolous.[6]

Appellant's next issue challenges the racial makeup of the jury. *Anders Brief* at 16. Appellant points out that he is an African American male, and that his jury was comprised solely of Caucasian individuals from Chester County. *Id.* Appellant claims that he was deprived of his constitutional right to a fair trial on this basis. *Id.*

Appellant's claim appears to be based on the United States Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986).

> To establish any merit to a *Batson* claim, [a defendant] must establish a *prima facie* case of improper use of peremptory challenges [during jury selection]. To do so, a defendant must establish that:
>
> > (1) the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; (2) the defendant can rely on the fact that the use of peremptory challenges permits "those to discriminate who are [of] a mind to discriminate"; and, (3) the defendant, through facts and circumstances, must raise an inference that the prosecutor excluded members of the venire on account of their race. The third prong requires defendant to make a record specifically identifying the race of all the venirepersons removed by the prosecution, the race of the

---

[6] Even if Appellant had preserved a challenge, this Court cannot act as a fact-finder, reweigh the evidence, and disturb credibility findings based on a cold record. *See Commonwealth v. Sanchez*, 262 A.3d 1283, 1288-89 (Pa. Super. 2021) ("it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded [] evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record." (citations omitted)).

> jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense. After such a record is established, the trial court must consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of their race. If the trial court finds in the affirmative, it may then require the prosecutor to explain his or her reasons for the challenge. Once the defendant makes a prima facie showing, the burden shifts to the Commonwealth to come forward with a neutral explanation for challenging [Caucasian] jurors.
>
> We note that [t]he striking of a number of individuals belonging to some cognizable minority group, however, is not dispositive that a violation of **Batson** has occurred.

**Commonwealth v. Saunders**, 946 A.2d 776, 783 (Pa. Super. 2008) (citations, footnote, and some quotation marks omitted).

Preliminarily, we note that, at the conclusion of jury selection, **Appellant lodged no objection to the selection of any juror**. Because Appellant failed to object on the record to the jury empaneled, or to any peremptory strike by the Commonwealth, this issue is waived on appeal and is frivolous. **See** Pa.R.A.P. 302(a); **Commonwealth v. Burns**, 765 A.2d 1144, 1148 (Pa. Super. 2000) (waiving a challenge to the striking of a juror where appellant failed to object on the record, pursuant to Rule 302(a)).

In his final issue, Appellant claims his trial counsel rendered ineffective assistance. **Anders** Brief at 17. With respect to ineffectiveness claims, our Supreme Court has explained that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." **Commonwealth v. Grant**, 813 A.2d 726, 738 (Pa. 2002). The Pennsylvania

Supreme Court has recognized three exceptions to this general rule. *See*

***Commonwealth v. Holmes***, 79 A.3d 562, 577-80 (Pa. 2013);

***Commonwealth v. Delgros***, 183 A.3d 352, 361 (Pa. 2018).

The first exception applies to extraordinary circumstances, when a "trial court, in the exercise of its discretion, determines that a claim [] of ineffectiveness is both meritorious and apparent from the record so that immediate consideration and relief is warranted." ***Holmes***, 79 A.3d at 577-78. The second exception addresses "multiple and fairly common ineffectiveness claims," which are accompanied by the defendant's "knowing, voluntary, and express waiver of [Post Conviction Relief Act ("PCRA")[7]] review." ***Id.*** at 577-78, 580 (footnote added). The third exception requires "trial courts to address claims challenging trial counsel's performance where the defendant is statutorily precluded from obtaining subsequent PCRA review." *See **Delgros***, 183 A.3d at 361. **To qualify for any of these exceptions, an appellant must first raise his ineffectiveness claims before the trial court**, as the trial court must have an opportunity to review such a claim and for the parties to fully develop the record. ***Delgros***, 183 A.3d at 360-62; ***Holmes***, 79 A.3d at 576.

---

[7] 42 Pa.C.S.A. §§ 9541-9546.

Appellant failed to raise his ineffectiveness claim before the trial court. Accordingly, it is waived on direct appeal.[8]  We agree with Counsel's assessment that this claim is therefore meritless and frivolous.

Finally, our independent review discloses no other non-frivolous issues that could be raised by Appellant on direct appeal.  *See Falcey*, 310 A.3d at 315.  Accordingly, we grant Counsel's request to withdraw from representation and affirm Appellant's judgment of sentence.

Petition to withdraw granted.  Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/3/2025

---

[8] Appellant may, however, present his ineffectiveness claims in a timely filed petition for relief under the PCRA.